UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| C. Alan Powell et al. ) | |
| Plaintiffs, ) | |
| ) | Civil Case No. 04-1100 (JOF) |
| v. ) | |
| Jacqueline Barrett et al. ) | |
| Defendants ) | |

## DECLARATION OF RICHARD A. BERK

I, Richard Berk, declare and say:

1. I have personal knowledge of the information set forth herein and, if called upon to testify, I could and would do so as is set forth in the following paragraphs.

2. I am currently a Professor of Statistics and Sociology at UCLA. I have appointments in both the Department of Statistics and the Department of Sociology, although all of my teaching is done in the Department of Statistics. I am also the Director of the UCLA Statistical Consulting Center, which provides technical assistance to clients in need of statistical help. These clients may be on campus or off campus.

3. I have a B.A. Degree in psychology from Yale University and a Ph.D. in sociology from Johns Hopkins University. While in graduate school, I specialized in statistical methods and began teaching statistics part time at local colleges. I have been teaching statistics at both the undergraduate and graduate levels for 30 years. Over that time, I have published a dozen books and over 150 journal articles and book

chapters. My work on quantitative research methods has been recognized by the American Sociological Association through the Paul F. Lazersfeld award for contributions to research methodology. I am a fellow of the American Association for the Advancement of Science and the American Statistical Association. I have recently completed by second term on the National Research Council's Committee on Applied and Theoretical Statistics. Formerly, I was the Vice Chair of the Board of Directors of the Social Science Research Council (and sat on the board for two terms of 3 years each). Attached to this Declaration is my curriculum vitae, which provides a more comprehensive description of my background.

4. My current research has been funded by the National Science Foundation and the Environmental Protection Agency. Both awards were for statistical applications, one for evaluating integrated assessment models used in climate research, and one for the development of new statistical tools to permit sound generalizations from environmental case studies.

5. In my work I have often been called upon to analyze data on the conduct of government agencies to determine whether that conduct has been consistent with an articulated purpose or policy. Also, on many occasions I have been called upon to analyze data to determine whether there is evidence of discriminatory conduct, such as, for example, discrimination based on age or socio-economic status. I am also experienced in analyzing highly sensitive and confidential inmate data from law enforcement databases such as the ones that may be implicated in this case. I was until recently retained by the California Department of Corrections for whom I did various analyses based on confidential databases.

6. I have been qualified in California and federal courts to testify as an expert in matters relating to statistical analyses on many occasions. A small sample includes the following cases: Washington and Jenkins v. United States, No. CR 91-632(A)-TJH (U.S.D.C., C.D. Cal.); Sumner Peck Ranch, Inc., et al., v. Bureau of Reclamation, et al., No. CV-F-91-048-OWW (U.S.D.C., E.D. Cal.); Henry and Lopez

v. United States, No. CR 94-628-CBM (C.D. Cal.); Belmontes v. Vasquez, No. CV-89-0736-EJG-JFM (U.S.D.C., E.D. Cal.); Barajas-Flores v. United States, No. CR-93-837 (U.S.D.C., C.D. Cal.); Lawson v. Gates, No. BC 031232(Los Angeles Superior Court).

7. This declaration is prepared in support of plaintiffs' motion for class certification regarding the overdention of inmates and strip search of arrestees and court returns subject to immediate release.

8. In 2000, I was retained by counsel for plaintiffs in the class action matter of *Williams v. County Of Los Angeles*, Case No. CV 97-03826-CW, in the Central District of California. As background, the *Williams* class action involved three (3) classes, which I will briefly describe below. The Overdetention Class consisted of persons who were not released from Los Angeles County Jail within a reasonable time after they became entitled to release. The Strip Search Class consisted of persons who were in the custody of law enforcement and taken to Court, became entitled to release while at the Courthouse, were remanded to the custody of the Los Angeles County Sheriff's Department and then returned to County Jail, and were subjected to an unlawful strip and/or visual body cavity search prior to their release. The Wrong Warrant Class consisted of persons who were arrested based on a warrant who were not, in fact, the person for whom the warrant was issued, and were purportedly held without a timely determination of whether s/he was the correct arrestee, even if LASD personnel were notified that the warrant was not for him or her.

9. My task in *Williams* was to analyze and process data maintained by the County in Los Angeles Sheriff's Department (hereafter "LASD") databases necessary to determine the Overdetention class members and the prerequisites for Strip Search Class members (who then had to file a claim that they were in fact strip searched), the length of overdetention for the Overdetention Class, and the identifying information to notify and authenticate class members for both the Overdetention and Strip Search Classes. To accomplish this task, LASD turned over all data that I concluded were

necessary to address the issues for which I was retained, which was then agreed to by the parties with the participation of the court. It was subject to an Agreement that the data be maintained in strict confidence, and not be used for any purpose other than the class claims administration in *Williams*. To further protect privacy, prior to turning the information over to me, LASD redacted the data to remove personal identifying information such as names and addresses, but providing a unique identifier such as a criminal identification number. Information to determine membership in each of the three classes was contained in (1) the LASD's mainframe database used to track jail inmates, known as the Automated Justice Information System (AJIS), (2) reports and archived data from the Sheriff's Department's CJSS computer system, (3) data transcribed from copies of hand written log pages maintained by the Sheriff, and (4) deposition testimony by Sheriff's employees who were the persons most knowledgeable regarding the aforementioned databases. *Williams* involved analysis of several hundred thousand inmate records, and resulted in class notices being mailed to approximately 300,000 class members. At the conclusion of *Williams*, all data was returned to the County Sheriffs. My colleagues and I never had the personal identifying information for class members, except just prior to class notice, when we prepared the final data for use by the Class Administrator. All the contact activity was conducted by the Class Administrator retained pursuant to an agreement of the parties to conduct class notice. (This latter occurred after settlement.).

     10.    I have subsequently acted as an expert in the cases of *Bynum v. District of Columbia* Case No. 02-956 (RCL) (D.D.C.) and *Johnson v. District of Columbia* Case No. 02-2364 (RMC) (D.D.C.). *Bynum* is a case against the District of Columbia for overdetentions and routine strip searches of persons taken to court and ordered released who nonetheless were returned to jail and subsequently strip searched prior to release. *Johnson* is a case against the District of Columbia and the United States Marshal Service, which acts as the Marshal for the District of Columbia, for the routine strip searched of minor offenders who have been arrested, regardless of

whether their arrest is for crimes involving drugs or violence. In those two cases, I have analyzed, or am in the process of analyzing, the computer data maintained by the relevant government entities to determine who are class members and what the nature of their injury is based on the data, e.g., for how long they were overdetained. In *Bynum*, I submitted a declaration proposing a trial plan for sampling the class for trial purposes, from which projections could be made to the class as a whole. It is my understanding that the court there accepted my proposal in concept although details had to be worked out after completion of the data review.

11.     Plaintiffs' counsel has retained me in this case to provide my opinion on a plan to determine damages for the class. Since discovery has not yet occurred in this case, I am unable to rely on documents at this time. However, based on my experience acting as an expert in the similar cases in Los Angeles and Washington D.C., and as a consultant to the California Department of Corrections, I have found that it is generally the case that jails and prisons maintain computerized records for each arrestee and/or inmate, which contains detailed information regarding each inmate, usually including such information as arrest date, charges, case numbers, outcome of charges, sentence where applicable, release date and the like. I have also found that such records will contain a variety of unique identifying information such as name, birth date, address, drivers' license, social security number and the like. Although these may be written in a variety of programs, my graduate students and I have been able to put them into a uniform program and relate them, allowing them to be used to analyze the class or potential class. Assuming that Fulton County keeps such records, I believe it is highly likely that I will be able to perform a similar analysis for arrestees and inmates of the Fulton County Jail to what I have done or am doing in Los Angeles and Washington D.C.

12.     The first step in my being able to analyze the data regarding the jail will be to have access to any manuals that describe the purpose or function of any databases maintained by the defendants. Based on that review, I anticipate that it will

5      **1371-502091**

identify the fields in any relevant databases, and describe the information contained in each field.

13. In order to determine class membership, I will have to review such database manuals and any other documents that describe the databases, their fields or structure. From there I can preliminarily determine which fields from which databases are necessary to properly identify who has been overdetained and/or strip searched. I will also seek fields necessary for me to identify the length of overdetention for each individual. If, after reviewing the data contained in these fields, I find that more information/fields are necessary, I will contact plaintiffs' counsel to make the request. To what extent I will need data from the defendants' databases I cannot say at this point. After I have had a chance to review all the database manuals and documents, I will better be able to address that issue. I would like to have those as soon as possible so that I can provide a more informed opinion on this issue. It may be that I will require samples to make the determination of what I need. It is premature for me to say.

14. It is not necessary for me to obtain personal information about an inmate so long as there is a unique anonymous identifier related to each inmate and, to the extent that correlation of different databases is required, such a unique identifier crosses databases. In my experience, such unique identifiers are common, often as a prisoner or inmate number. If they don't cross databases, they can be correlated by a combination of factors such as name, birth date, case numbers, drivers' license and social security number, to the extent they are available. Once I see more detailed information on the databases, I will be able to address this issue further.

15. My tasks based on the information provided by the Fulton County Jail would be 1) to identify overdetention class members, and determine the length of overdetention and 2) to identify members of the strip search class members (or potential class members if there is an issue of whether all people in a certain category were strip-searched).

16. Assuming that the computerized data allows analysis along the foregoing lines, I anticipate that I will also be able to easily cull out a random statistical sampling of class members that could provide the basis for drawing conclusions about the class as a whole. Its size would depend on the level of reliability sought and whether certain variables need to be addressed for different sub-groups within the sample. It is too early for me to address that issue. Normally, a sample of several hundred is sufficient to draw conclusions applicable to the class as a whole within a certain specified and highly reliable margin of error. Because I have yet to review the data, it is premature at this stage to opine as to a specific number of records or range of numbers that would constitute a statistically valid sample.

17. It is well known and widely accepted that probability (random) sampling is desirable for three reasons. First, it provides a formal and scientifically valid vehicle for projections from a sample to the population from which it was selected. It is used for this purpose by any number of government agencies (e.g., the US Census Bureau) and commercial enterprises (e.g., major accounting firms such as Deloitte Touche). Second, it provides a formal and scientifically valid way to estimate the uncertainty in such projections. Third, probability samples pass the "sniff test" in that the selection is undertaken with procedures that are absolutely neutral with respect to the issues at hand. That is, there are no grounds for suspicion that the sample was chosen in a manner that favors any particular set of facts. Without probability sampling, all three desirable attributes are lost. Thus, it would be possible if I am so directed to choose a random sample that could be tried in court, surveyed or otherwise assessed in some fashion, and the conclusions reached projected onto the class as a whole within a certain margin of random error.

18. To elaborate, the procedure I propose here is the following:
   a. Analyze the data available from the Fulton County Jail and any other relevant sources, and determine the method to establish the extent of

overdetentions and of strip searches and/or candidates to be strip-searched.

b. Determine the appropriate size of a random sample of people who were overdetained, and people who were strip-searched. I anticipate that the sample size would be in the low hundreds, which should be sufficient assuming a normal distribution of awards, and a reasonable and expected standard deviation. Based on these assumptions, I would expect to be able to conclude with a 95% confidence level or higher that the mean award is within a relatively small dollar value of what the mean for the population as a whole would be. I am speaking in generalities at this point due to the absence of data, and anticipate that I will be able to provide a more informed opinion once the data is available and has been analyzed. However, the confidence level within certain dollar values can only finally be determined when the trier of fact reaches it s conclusions.

c. I anticipate that the trial would occur in three phases. The first phase would be the liability phase. Assuming liability, then the second phase would be to address the damages to be awarded to the random sample. I would address the issues, and presumably any defense expert playing a similar role for the defendants. I assume there would also be other experts in other areas, such as a mental health expert or team of experts, for both sides. The jury would deliberate and reach conclusions based on the random sample. Its conclusions might or might not include the value of one day of overdetention, and the value of a strip search. It might also address certain variables, such as whether the individual was a first offender, whether the individual was charged with a crime, or the nature of the charges or other claims against the individual, as well as how these variables influence its decisions on value. Again, it is too early in the case to address these issues in the absence of the records.

   d. The third and last phase of the trial would then address the class as a whole, the mean values for the random sample, the range of the possible deviation of the mean at different confidence levels, and the extrapolation of the damages from the random sample to the class as a whole based on these and other factors.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of July, 2004, at Los Angeles, California.

                                              Richard A. Berk